**In re CORKSCREW GOLF PROPERTY LAND TRUST, d/b/a Wildcat Run, Debtor.**

**Bankruptcy No. 86-2968-9P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Nov. 15, 1988.

Russell Blain, Tampa, Fla., for debtor.

Merrill N. Johnson, Naples, Fla., for Fischl.

## ORDER ON OBJECTION TO CLAIM

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is the second phase of an ongoing controversy between Robert O. Fischl (Fischl) and Corkscrew Golf Property Land Trust (Trust). The controversy centers around a claim of Fischl who seeks an allowance of a claim in the amount of $225,000.00 based on a claim for compensation for his services allegedly rendered by him to Trust. At the initial phase, the matter was tried, and this Court by an order entered on March 18, 1988, determined and held that the agreement between Fischl and the Trustee for the Trust (Exhibit No. 1) was a non-exclusive service agreement and Fischl will only be entitled to recover compensation if, in fact, he procured the loan or, in the alternative, a letter of commitment. Based on the foregoing, this court ruled that Fischl is not entitled to any recovery under the Agreement, but should be given the opportunity to show how much, if any, did his work produced benefit the Trustees in their efforts to obtain the necessary financing for the development of the project, particularly to what extent his labor and services assisted the Trustee to ultimately obtain a construction loan from the Barnett Bank of Miami in the amount of $10,500,000.00. Based on this, it was ordered that the matter shall be rescheduled for trial to enable Fischl to present evidence in support of his claim limited to the issue. In due course, the matter was set for trial at which time the facts which are relevant to the resolution of these issues have been established and which are as follows:

In late December of 1982, Thomas Wright, who was the marketing director for the project owned by the Trust, known as Wildcat Run, introduced Fischl to the Trustees and suggested to the Trustees that Fischl would be able to assist them in obtaining the financing necessary for the ultimate development of the project. The parties discussed this proposition and ultimately agreed and entered into a contract mentioned earlier. The contract was executed on January 13 (Debtor's Exhibit No. 2).

It appears that shortly thereafter, Fischl was furnished a space in the office maintained by the Trust and also furnished some pertinent data and materials relating the history of this development from which Fischl prepared a brochure. The brochure does not contain any financial data of the project but merely consists of compilation

of certain facts in the history of the project and indicates on its face that the project was intended to be a golf resort operation in which Arnold Palmer may be involved. It appears that the Trustees, having unsuccessfully pursued a construction loan, contacted several mortgage brokers who all worked toward obtaining the necessary financing for the completion of the project. It is without dispute that Mr. Fischl worked from January 13 through January 19 on this brochure. Fischl also contacted the office of Citicorp located in St. Petersburg, the office of Federal Savings & Loan Association in Tampa, and the office of Great Financial Corporation located in Orlando. None of these contacts produced any result, and none of these conferences even reached a serious negotiating stage although representatives of Citicorp expressed some interest and did actually visit the project. Although the Trustees obtained a commitment for financing from Great Financial prior to Fischl's arrival on the scene, this commitment never came to fruition and was ultimately cancelled.

It further appears that Fischl, who lives in Chicago, after the initial contact with the Trustees, made several trips up north and apparently contacted or attempted to contact Mellon Financial Institute in Pittsburgh, but again without any success.

The initial attempt to obtain financing was based on a so-called "equity kicker" concept, which contemplated to grant equity interest to any lender in exchange for an agreement to lend the funds necessary to complete the development of the project. It appears that the president of a golf course construction company of Arnold Palmer suggested that it might be a good idea to offer an "equity kicker" to Arnold Palmer for his guarantee of a loan which would make the project more attractive, which in turn would lead to a favorable consideration by lenders of any loan request.

There is no question that approval never materialized and the fact of the matter is that the proposition was not even presented to Arnold Palmer. Be that as it may, the idea was completely abandoned, but not because of any suggestion by Fischl, but because of the Trustee's inability to obtain an agreement by Arnold Palmer to participate in the project. The idea to abandon the equity kicker concept, even if it came from Fischl, played no meaningful role whatsoever in the loan ultimately obtained and was dropped because of the Trustee's inability to get a favorable response from Arnold Palmer. At one time the Trustees in their pursuit to obtain a loan projected a construction cost of $15,465,494.00 (Creditors' Exhibit No. 18). Fischl suggested that the reason for the Trustees' inability to get the loan was that they were asking too much and $6,000,000.00 would be more than sufficient to develop the project. It also appears that at one point there was a discussion of pursuing a $1,000,000.00 letter of credit for the purpose to "sweeten the pot." It developed, however, that this idea came about because one of the beneficiaries of the Trust, Mr. Miller, refused to agree to subordinate his mortgage encumbering the project to the mortgage to be granted to the prospective lender. For this reason, it was suggested that since the prospective lender would not receive a first mortgage encumbering the entire tract of land, including the tract on which Miller already held a mortgage, the difference should be made up by granting a letter of credit in favor of the lender.

Concerning the idea of utilizing the letter of credit, even if that idea came from Fischl, again it did not play any role in the loan ultimately obtained by the Trustees and the idea was abandoned because the lender did not request it as a condition precedent to grant the loan.

It appears that one of the beneficiaries of the Trust was an officer of Barnett Bank of Lee County who asked the Trustees in November of 1982, or before Fischl arrived on the scene, to give him some financial data on the project. Because of his position with the Bank, it was obvious that he could not present the same to the Bank he worked for. For this reason, he forwarded the financial information to the Barnett Bank of Miami. It further appears that the Trustees contacted the Barnett Bank of Miami and suggested a meeting to

discuss this prospective loan. On January 26, 1983, the Trustees met with Barnett of Miami and thereafter seriously commenced the negotiations for a construction loan for $10,500,000.00. The Trustees continued to provide Barnett with financial data of the project. There is no evidence in this record to indicate that the brochure prepared by Fischl was ever presented to Barnett; that Fischl had any contact whatsoever with Barnett of Miami at any time and played any role of any sort in the ultimate conclusion of this construction loan.

Based on the foregoing, Fischl now contends that in spite of Barnett of Miami, his labor benefited the Trust by coaching the Trustees and advising them how to make presentations to prospective lenders; by suggesting to them to abandon the equity kicker type of financing; by suggesting to them to reduce the loan request from $15,000,000.00 to $6,000,000.00, or by utilization by them of the material prepared by him.

Considering this record even in the most favorable light to Fischl, it is clear that the idea of commercial financing vs. equity kicker financing played no part whatsoever in the ultimate success in obtaining the loan. The equity kicker approach was not dropped because of his advice, but simply because it soon became evident that Arnold Palmer had no intention to become involved with this development project.

Considering the alleged benefit of his advice to the Trustees that they should request only $6,000,000.00 it equally fails to rise to the level of a benefit for obvious reasons that the loan obtained was first of all $10,500,000.00 and Barnett of Miami would not have even considered a $6,000,000.00 loan inasmuch as it would have been woefully inadequate to complete such a project of this type and size. There is no evidence in this record to show that a picture that Fischl had taken was ever used as part of a presentation of Barnett Bank, neither was the brochure prepared by him. (Exhibit. No. 14)

Based on the foregoing, there is hardly any doubt that Fischl was just one of several brokers who attempted to obtain the financing. Under his contract he certainly would have gotten a very hefty commission if he had succeeded, $225,000.00 conceivably within a few days after the contract was signed. First, it was an independent contractor and not an employee of the Trust. His time was his own at all times. The fact that the Trustees gave him a space in the office maintained by the Trust is without significance. In sum, it is clear that whatever services he performed, his services played no meaningful role whatsoever in the ultimate success of the Trustees in pursuing the construction loan from Barnett of Miami. Based on the foregoing, this Court is satisfied that Fischl is not entitled to have his claim allowed on a quantum meruit basis, and the objection to claim of Robert Fischl should be sustained.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Trustee's Objection to the claim of Robert Fischl be, and the same is hereby, sustained and the claim by Fischl is disallowed in toto.

DONE AND ORDERED.